******************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************

# LINDA STELLER *v.* RODNEY STELLER
## (AC 39014)

Sheldon, Keller and Bright, Js.

*Syllabus*

The plaintiff, whose marriage to the defendant previously had been dissolved, appealed to this court from the judgment of the trial court modifying the defendant's alimony, life insurance and disability insurance obligations. The parties' settlement agreement, which had been incorporated into the dissolution judgment, required the defendant to pay the plaintiff alimony that was nonmodifiable for four years, except under certain circumstances. It also required the defendant to maintain life and disability insurance to secure the plaintiff's alimony. In addition, the agreement provided that the defendant, upon reaching the age of sixty-five years, was entitled to retire and to a "second look" at his alimony obligation without the need of showing a substantial change in circumstances, and that if the defendant were to sell his dental practice, he would pay the plaintiff 20 percent of the net consideration received at the time of sale and the closing of title. After turning sixty-five, the defendant filed a motion for modification seeking to modify his alimony, life insurance and disability insurance obligations because he wanted to reduce his work schedule and to increase his vacation time. Following a hearing, the trial court found that the plaintiff had a gross earning capacity of $20,800 per year and that the defendant had a gross earning capacity of $200,000 per year, in light of his anticipated reduced work schedule in 2016. The court also found that the defendant was expected to sell his dental practice later that year, at which time the plaintiff would receive $120,000 as a result of that sale. On the basis of those findings, the court, stating that it had considered the relevant statutory (§ 46b-82) criteria, granted the defendant's motion for modification and ordered certain reductions to his alimony, life insurance and disability insurance obligations. On the plaintiff's appeal to this court, *held*:

1. The plaintiff could not prevail on her claim that the trial court improperly determined that the defendant's earning capacity was less than his actual current income, as the plaintiff failed to demonstrate that the court misinterpreted or misapplied the term "earning capacity" as that term is used in § 46b-82; the court's determination was entirely consistent with the parties' agreement, which explicitly contemplated a change in the defendant's work hours when he reached the age of sixty-five, confirmed the defendant's right to retire at that age and provided for a "second look" at alimony, without the need to show a substantial change in circumstances, even if he did not retire, and, therefore, a finding of an earning capacity less than the defendant's current income was amply justified.

2. The trial court's finding that the defendant's gross earning capacity in 2016 was $200,000 per year was clearly erroneous, as it was not supported by the evidence but, instead, was based on that court's unsupported assumptions and the speculative testimony of the defendant, which left this court with the definite and firm conviction that a mistake had been committed: the trial court's finding was based on its clearly erroneous subordinate finding that the defendant had earned only $260,000 in 2015, which did not take into account all of the defendant's sources of income, but only his income from wages, and the evidence did not support the court's conclusion that a reduction in the defendant's hours from forty to thirty-three per week, and an increase in his vacation time from six to ten weeks per year, would cause his gross earning capacity to decrease from approximately $469,000 in 2014 to $200,000 in 2016; accordingly, because, pursuant to § 46b-82 (a), the court was required to consider each party's amount and sources of income and earning capacity when determining alimony, the case was remanded for a new hearing on the defendant's motion for modification, and because the trial court based its finding as to the defendant's net weekly earning capacity on its clearly erroneous finding as to his gross annual earning capacity, that finding

also was clearly erroneous.

3. Although the trial court's finding that the sale of the defendant's dental practice was expected to occur in 2016 was not supported by the evidence and was clearly erroneous, because this court reversed the judgment of the trial court and remanded the case for a new hearing on the defendant's motion for modification and this error was not likely to recur on remand, it was not necessary for this court to determine if the trial court's error was harmful; moreover, this court declined to review the plaintiff's claim challenging the trial court's findings as to her gross annual earning capacity and net weekly earning capacity in light of this court's reversal of the trial court's judgment and remand of the case for a new hearing on the motion for modification.

4. Contrary to the plaintiff's claim, the trial court properly conducted a "second look" de novo review of the defendant's alimony obligation in accordance with the parties' agreement and properly considered the criteria set forth in § 46b-82 in accordance with relevant case law in reaching its decision; the plain language of the parties' agreement permitted the court to take a fresh look at the defendant's alimony obligation and the parties' financial circumstances after he reached the age of sixty-five, without first having to find a substantial change in circumstances, and, in conducting its de novo review, the court specifically stated that it had considered the statutory criteria pursuant to § 46b-82, and its memorandum of decision reflected that consideration.

5. The plaintiff could not prevail on her claim that the trial court abused its discretion by lowering the defendant's life and disability insurance obligations, which was based on her claims that insurance orders are not modifiable and that the defendant failed to prove a substantial change in circumstances; the relevant insurance provisions in the parties' agreement clearly provided that they were meant to secure the plaintiff's entitlement to alimony and that they were modifiable by the court and terminable upon the termination of alimony, and, therefore, on remand, the trial court could consider whether the defendant's insurance obligations should be modified in connection with its resolution of the defendant's motion for modification of his alimony obligation.

Argued January 30—officially released May 1, 2018

*Procedural History*

Action for the dissolution of a marriage, and for other relief, brought to the Superior Court in the judicial district of New Haven and tried to the court, *Swienton, J.*; judgment dissolving the marriage and granting certain other relief in accordance with the parties' settlement agreement; thereafter, the court, *Shluger, J.*, granted the defendant's motion for modification of alimony, life insurance and disability insurance and issued certain orders, and the plaintiff appealed to this court; subsequently, the court, *Shluger, J.*, issued an articulation of its decision. *Reversed*; *further proceedings*.

*Samuel V. Schoonmaker IV*, with whom was *Wendy Dunne DiChristina*, for the appellant (plaintiff).

*Leslie I. Jennings-Lax*, for the appellee (defendant).

*Opinion*

BRIGHT, J. The plaintiff, Linda Steller, appeals from the judgment of the trial court modifying the alimony, life insurance, and disability insurance obligations of the defendant, Rodney Steller. The plaintiff claims that the trial court: (1) improperly determined that the defendant's earning capacity was less than his actual income and then based its alimony order on that determination; (2) made clearly erroneous findings, which were unsupported by the evidence, regarding the defendant's gross and net earning capacities, her earning capacity, and the amount she would receive from the purported sale of the defendant's dental practice later that year; (3) failed to apply the proper legal principles, in accordance with General Statutes § 46b-82 and relevant case law, for resolving a motion for modification of alimony; and (4) abused its discretion by lowering the defendant's disability and life insurance obligations. We agree with the plaintiff on the second claim and reverse the judgment of the trial court.

The following facts inform our review. The parties were married in 1973, and two children were born of that marriage, both of whom have reached adulthood. On October 21, 2008, the court rendered a judgment dissolving the parties' marriage, which incorporated by reference the parties' settlement agreement (agreement). Article 4.1 of the agreement provides in relevant part that the defendant will pay to the plaintiff alimony in the amount of $8333.33 per month, which is nonmodifiable for the first four years, unless circumstances arise that substantially reduce the defendant's earnings or earning capacity based upon his health or some outside factor, not including the voluntary sale of his dental practice. Article 4.1 also defines "substantially diminishes his earnings" to mean "that the [defendant's] earnings are reduced to less than TWO HUNDRED THIRTY-SEVEN THOUSAND, FIVE HUNDRED DOLLARS ($237,500) per year, gross income from employment."

Article 4.3 of the agreement provides that the defendant is entitled to retire at the age of sixty-five, and that he is entitled to a "second look" at his alimony obligation upon reaching age sixty-five, without the need for establishing a substantial change in circumstances.[1] The agreement requires the defendant to maintain life insurance in the amount of $750,000 to secure the plaintiff's entitlement to alimony. This amount is reducible, in the defendant's discretion, by $100,000 per year, commencing on the fifth anniversary of the judgment, provided it may not be reduced below $450,000 until the termination of alimony or pursuant to court order. The agreement also requires that the defendant maintain disability insurance in the amount of $10,000 per month, modifiable as of the fifth year of the judgment. Additionally, the agreement provides

that, if the defendant sells his interest in his dental practice, he shall pay to the plaintiff a sum equal to 20 percent of the net consideration received at the time of sale and the closing of title.

Following the defendant's sixty-fifth birthday, he filed a motion, on the basis of the October 21, 2008 judgment and the parties' agreement, requesting a modification or termination of alimony and of life insurance and disability insurance, contending that he has reached the age of sixty-five and that, although he "has not yet retired, he wishes to reduce his workload and work schedule but is refraining from doing so [to] the extent desired until he can determine his alimony obligation, if any, going forward."

On January 29, 2016, the court held a hearing on the defendant's motion, and, in a February 3, 2016 memorandum of decision, it set forth the following relevant findings. At the time of the parties' dissolution, the plaintiff earned approximately $6000 per year working as the office manager/receptionist/bookkeeper for the defendant's dental practice, and the defendant earned $378,000 per year. Both parties worked full time. Their forty-three page agreement, which had been incorporated into the judgment of dissolution, provided for a distribution of the parties' $2.5 million in marital assets. The plaintiff was awarded substantial assets through the agreement. She currently "has mutual funds, [individual retirement accounts] and annuities worth $1 million. She claims to earn only $59 per week or approximately $3000 per year on dividends from her investments . . . . In addition she owns a home which she values at $450,000 with a $273,000 mortgage or $176,000 in equity." Since the date of dissolution, the plaintiff has not sought employment or ascertained the amount of her forthcoming social security benefits, despite knowing that the alimony provision in the agreement is modifiable and that the defendant is entitled to request a second look at alimony upon reaching the age of sixty-five. The plaintiff works as a nanny for her grandchildren approximately forty hours per week for no fee. She has no earned income. The court found that the plaintiff has an earning capacity of $20,800 per year.[2]

As to the defendant, the court found that he consistently has worked forty hours per week over the years and that he earned approximately $528,000 in 2013, $469,000 in 2014, and $260,000 in 2015. The court further found that the defendant wants to reduce his workload to thirty-three hours per week, with increased vacation time to ten weeks per year. Consequently, the court found that the defendant has an earning capacity of $200,000 per year. The court further found that the defendant was expected to sell his dental practice later in 2016, for the estimated amount of $600,000, at which time the plaintiff would receive $120,000 as a result of

that sale.

The court also stated that the plaintiff's financial affidavit provides that her expenses have been reduced to $106,000 per year,[3] but the court found that the plaintiff's expenses were inflated and that she "could continue to enjoy her present lifestyle without the necessity of working with $78,156 per year." Further, the court found that the plaintiff is "woefully ignorant as to her financial circumstances, opportunities, and investments . . . [as well] as to her Social Security rights . . . ."

On the basis of these findings, the court, stating that it had considered the statutory criteria set forth in § 46b-82, granted the defendant's motion for modification and modified his alimony, life insurance, and disability insurance obligations. Specifically, the court ordered, effective June 9, 2016,[4] the plaintiff's sixty-sixth birthday, the defendant's alimony obligation reduced to $60,000 per year and his life and disability insurance obligations reduced by 50 percent.[5] This appeal followed.[6]

We begin by setting forth the standard of review. "An appellate court will not disturb a trial court's orders in domestic relations cases unless the court has abused its discretion or it is found that it could not reasonably conclude as it did, based on the facts presented. . . . In determining whether a trial court has abused its broad discretion in domestic relations matters, we allow every reasonable presumption in favor of the correctness of its action. . . . Notwithstanding the great deference accorded the trial court in dissolution proceedings, a trial court's ruling on a modification may be reversed if, in the exercise of its discretion, the trial court applies the wrong standard of law." (Citation omitted; internal quotation marks omitted.) *Williams* v. *Williams*, 276 Conn. 491, 496–97, 886 A.2d 817 (2005). "Furthermore, [t]he trial court's findings [of fact] are binding upon this court unless they are clearly erroneous in light of the evidence and the pleadings in the record as a whole. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *Norberg-Hurlburt* v. *Hurlburt*, 162 Conn. App. 661, 672–73, 133 A.3d 482 (2016).

"In a marriage dissolution action, an agreement of the parties executed at the time of the dissolution and incorporated into the judgment is a contract of the parties. . . . The construction of a contract to ascertain the intent of the parties presents a question of law when the contract or agreement is unambiguous within the four corners of the instrument. . . . The scope of review in such cases is plenary . . . [rather than] the

clearly erroneous standard used to review questions of fact found by a trial court." (Citation omitted; internal quotation marks omitted.) *Williams* v. *Williams*, supra, 276 Conn. 497. Because the language of the agreement in the present case, as incorporated into the dissolution judgment, is clear and unambiguous, our review is plenary.

"[Our Supreme Court] and [this court] have often described financial orders appurtenant to dissolution proceedings as entirely interwoven and as a carefully crafted mosaic, each element of which may be dependent on the other. . . . In general, the same factors used by the court to establish an initial award of alimony are relevant in deciding whether the decree may be modified. . . . More specifically, these criteria, outlined in . . . § 46b-82, require the court to consider the needs and financial resources of each of the parties . . . as well as such factors as the causes for the dissolution of the marriage and the age, health, station, occupation, employability and amount and sources of income of the parties." (Citations omitted; footnote omitted; internal quotation marks omitted.) *Gay* v. *Gay*, 70 Conn. App. 772, 776, 800 A.2d 1231 (2002), aff'd in part, 266 Conn. 641, 835 A.2d 1 (2003). We now consider each of the plaintiff's claims.

I

The plaintiff first claims that the court "improperly determined that the defendant's earning capacity was lower than his actual current income, and then based its orders on his earning capacity rather than actual income." She argues: "A voluntary retirement does not result in a loss of earning capacity, just as a proposed reduction in hours is not the same as a loss of earning *capacity*. . . . [A]scribing a loss of earning capacity to the defendant when he is still working and completely employable at his current occupation is speculative and a misapplication of the law. He may or may not reduce his hours; he may retire or he may not." (Emphasis in original.)

The defendant argues that the court properly construed the term "earning capacity." He argues that the court "had before it evidence that the defendant was reducing his work hours and that the reduction in work hours would lead to a reduction in earnings." Further, the defendant argues that, because he reached the age of sixty-five and is entitled to a second look at alimony on the basis of the dissolution judgment, without a showing of a substantial change, and because he is experiencing health issues such as a stiff neck, arthritis, and increased stress, the court properly found that his earning capacity was reduced by his age and circumstances. We agree with the defendant.

Section 46b-82 (a) provides in relevant part: "In determining whether alimony shall be awarded, and

the duration and amount of the award, the court shall consider the evidence presented by each party and shall consider the length of the marriage, the causes for the . . . dissolution of the marriage . . . the age, health, station, occupation, amount and sources of income, earning capacity, vocational skills, education, employability, estate and needs of each of the parties . . . .”

“It is well established that the trial court may under appropriate circumstances in a marital dissolution proceeding base financial awards on the earning capacity of the parties rather than on actual earned income. . . . Earning capacity, in this context, is not an amount which a person can theoretically earn, nor is it confined to actual income, but rather it is an amount which a person can realistically be expected to earn considering such things as his vocational skills, employability, age and health. . . . [I]t also is especially appropriate for the court to consider whether the defendant has wilfully restricted his earning capacity to avoid support obligations . . . . Moreover, [l]ifestyle and personal expenses may serve as the basis for imputing income where conventional methods for determining income are inadequate.” (Citations omitted; internal quotation marks omitted.) *Milazzo-Panico* v. *Panico*, 103 Conn. App. 464, 468, 929 A.2d 351 (2007).

“Although it is true that the court generally increases the actual earned income of a party when it considers that party’s earning capacity, there is no statutory provision or case law that precludes a court from decreasing that income under appropriate circumstances. . . . [Our] case law is clear that earning capacity is the amount that a person can *realistically* be expected to earn . . . .” (Emphasis in original; internal quotation marks omitted.) *Elia* v. *Elia*, 99 Conn. App. 829, 833, 916 A.2d 845 (2007).

The plaintiff claims that the court misinterpreted the term “earning capacity” as that term is used in § 46b-82. She argues that this misinterpretation is demonstrated by the fact that the defendant’s actual earnings at the time of the hearing on the defendant’s motion for modification were greater than the earning capacity found by the court. We are not persuaded.

In this case, the defendant, at the January 29, 2016 hearing on his motion, testified that, *as of January 1*, he was “taking an additional afternoon off and . . . scheduling ten weeks [of] vacation per year.” He also testified: “After practicing dentistry for [forty] years . . . I’m starting to . . . have a few bodily issues. My neck has been stiff for six months. . . . I have a little bit of arthritis in my hand. And the stress of running any small business now is extremely difficult . . . .” This testimony provided a sufficient basis for the court to find that the defendant’s earning capacity is less than his current income. We find no error in this conclusion.[7] As we explained in *Elia*, our case law is clear that a

party's earning capacity is the amount that he or she *realistically can be expected* to earn. *Elia* v. *Elia*, supra, 99 Conn. App. 833. It is not the amount the party previously has earned or currently may be earning. See id.; *Milazzo-Panico* v. *Panico*, supra, 103 Conn. App. 468.

After reviewing the court's memorandum of decision and our relevant case law, we conclude that the plaintiff has failed to demonstrate that the court misconstrued or misapplied the term "earning capacity" or that it improperly determined that the defendant's earning capacity was less than his purported current earnings. In fact, the court's conclusion is entirely consistent with the parties' agreement, which explicitly contemplates a change in the defendant's work hours when he reached age sixty-five. Article 4.3 of the agreement confirms the defendant's right to retire at the age of sixty-five and provides for a "second look" at alimony, without the need to show a substantial change in circumstances, even if he did not retire. Under these circumstances, a finding of an earning capacity less than the defendant's current income is amply justified.

## II

The plaintiff next claims that the court made clearly erroneous findings, which were unsupported by the evidence, regarding the defendant's gross and net earning capacity, the plaintiff's earning capacity, and the amount the plaintiff would receive from the purported sale of the defendant's dental practice later in the year. We consider each of these in turn.

As set forth previously in this opinion: "[T]he trial court's findings [of fact] are binding upon this court unless they are clearly erroneous in light of the evidence and the pleadings in the record as a whole. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *Norberg-Hurlburt* v. *Hurlburt*, supra, 162 Conn. App. 672–73.

### A

The plaintiff claims that the court's "finding that the defendant has a gross annual earning capacity of $200,000 was not supported by the evidence." The plaintiff argues that "it is indisputable that the evidence of current actual gross income far exceeded the trial court's $200,000 per year finding." To support her argument, the plaintiff points to the defendant's financial affidavit, which discloses a gross weekly income from employment of $5006, his 2015 paystub, which showed wages of $260,319 in 2015, and his testimony revealing that, in addition to these wages in 2015, he made a voluntary contribution to his 401 (K) in the amount of $24,000, his business paid his family health insurance

premiums in the amount of $25,012, his limited liability company received rental income in the amount of $58,200, he received income in the form of car payments made by his business for one of his cars, and he had subchapter S flow through income that was not disclosed on the affidavit. She argues that "[n]o historical or expert evidence supports the trial court's finding that the defendant's earning capacity is $200,000" and that "[a]n earning capacity finding that is based on incompetent, equivocal, or speculative evidence cannot stand."

The defendant responds that the court properly concluded that his gross earning capacity was $200,000. He argues that "there was ample evidence, based on [his] testimony and paystubs regarding his 2015 income and his reduction in work hours to support the court's finding . . . ." We agree with the plaintiff.

The court's conclusion as to the defendant's earning capacity was based on a brief exchange between the court and the defendant. Initially, the court asked the defendant if he had "an estimate as to how much income [he would] be able to earn in [2016], based on [his new] schedule." The defendant responded that he "really [had not] thought about it too much. Whatever it is, it is." In response to further questions from the court, the defendant eventually testified that his *income* for 2016 would be "around $200,000." The defendant explained that he had reduced his work schedule to thirty-three hours per week by taking an additional afternoon off, so that he was no longer working on Wednesday or Friday afternoons, and that he also increased his vacation time from four to six weeks per year to ten or more weeks per year. The defendant testified that he expected to earn approximately *50 percent of his previous income*. The court asked the defendant if he meant that he was going to earn 50 percent less than the $250,000 in wages from last year, and the defendant responded: "[M]aybe not half of that, but I'm thinking of years past, too." The court then asked the defendant to explain how that was possible. The defendant explained that when he hired his associate, he also had to hire an additional dental assistant, and that the addition of these two people initially increased his expenses by approximately $200,000. As his associate and his new assistant developed their abilities and increased the number of patients they saw, the defendant saw an increase in his income as a result of these employees. The defendant stated, however, that, with the recent decline in the economy and his beginning to take more time off, business leveled off and then declined, such that his income went from $469,000 in 2014 to $260,000 in 2015. With his further reduction in hours and the need to eliminate one of his two dental hygienists, the defendant stated that he expects to earn only $200,000 going forward.

The problem with the defendant's back of the envelope estimate is that it was inconsistent with and contrary to other undisputed evidence, including the defendant's 2014 tax return, his 2015 statement of wages, and his October 8, 2015 and January 29, 2016 financial affidavits. A review of those records demonstrates that the defendant's income did not decline from $469,459 in 2014 to $260,000 in 2015. The defendant's 2014 tax return provides some detail as to the components of the defendant's income that year. Only $250,816 of his income that year was from wages. The defendant reported additional income of $185,436 from "[r]ental real estate, royalties, partnerships, S corporations, trusts, etc." This amount included rent his limited liability company received from his dental practice, as well as subchapter S flow through income from the dental practice.[8] The defendant's 2014 income also included $29,173 in other income.

At the time of the January 29, 2016 hearing on the defendant's motion, the defendant had not yet prepared his 2015 tax return, so it was not available for a fair comparison of the defendant's year to year income with 2014. The October 8, 2015 affidavit reflected year to date wages of $224,016, but it did not contain any of the additional income shown on the defendant's 2014 tax return. The defendant did provide the plaintiff with an updated financial affidavit dated January 29, 2016, in connection with his motion, but that affidavit also only set forth his income from wages. The defendant testified, however, that he did not include any other sources of income on the affidavit because he believed that the plaintiff had that information from his 2014 tax return. Also in evidence was the defendant's statement of wages for 2015, which reflected that the defendant's 2015 wages were $260,319. His January 29, 2016 financial affidavit reflected weekly wages of $5006, which is consistent with his statement of wages. Thus, despite the defendant's testimony that the economy took a toll on his business and "he took a lot more time off" in 2015, his wages in 2015 actually increased by almost $10,000 from 2014.

Furthermore, the defendant's 2015 "earnings" of $260,319 do not include other income received by the defendant, including additional income specifically related to his dental practice. For example, the defendant's limited liability company received rental income from the practice during 2015. The practice also paid certain personal expenses for the defendant, such as property tax on one of his personal vehicles and home cleaning expenses. The defendant's wage earnings also do not include any subchapter S flow through income that the defendant received in 2015. See generally footnote 8 of this opinion. According to the defendant's tax return, such income from his dental practice alone amounted to $151,306 in 2014.

Thus, although the defendant's 2015 tax return was not available and his updated financial affidavit did not itemize all of his sources of income, it is clear that his income in 2015 was greater than his wage earnings of $260,319. In fact, the only evidence before the court as to the amount of this other income was the defendant's testimony that he did not think he needed to provide such information on his updated financial affidavit because the plaintiff had the relevant information from his 2014 tax return, suggesting that such income in 2015 was not materially different. Consequently, the court's factual findings that the defendant earned approximately $469,000 in 2014 but only $260,000 in 2015 is the result of an unfair comparison of income because the $260,000 included only income from wages. It reflects an apples to oranges comparison of *total income* in 2014 to *wage income* in 2015. The court should have considered all of the defendant's income in 2015, not just his wages, which in 2014, made up only a little more than one half of his total income. Because the court's ultimate conclusion that the defendant's earning capacity is $200,000 was based, at least in part, on its clearly erroneous finding that the defendant earned only $260,000 in 2015, it, too, is clearly erroneous.

Furthermore, the evidence does not support the court's conclusion that a reduction in the defendant's hours from forty to thirty-three per week, and an increase in his vacation time from six to ten weeks per year, would cause his earning capacity to decrease from $469,000 in 2014 to $200,000 in 2016. When asked by the court how much income he would be able to earn based on that reduced schedule, the defendant responded that he really had not thought about it too much and "[w]hatever it is, it is." He then estimated that the impact would be "at least 50 percent of my income." He then identified two factors on which he based his estimate. First, the defendant testified that reducing his hours would require the practice to have one less dental hygienist. He produced no evidence, however, regarding the income generated by the hygienist. Second, the defendant testified that his business suffered due to problems in the economy in 2015, but, again, he produced no records or other evidence quantifying such an impact, and, in fact, the only evidence provided showed that his wages actually increased in 2015.

Overall, the court's conclusion that the defendant's gross earning capacity is $200,000 is not supported by the evidence; instead, it is based on unsupported assumptions and the defendant's speculation. We are left with the definite and firm conviction that a mistake has been committed. See *Norberg-Hurlburt* v. *Hurlburt*, supra, 162 Conn. App. 673. Consequently, the court's finding as to the amount of the defendant's gross earning capacity is clearly erroneous. Because § 46b-

82 (a) requires the court, when determining alimony, to consider each party's "amount and sources of income [and] earning capacity," the court's clearly erroneous finding as to the defendant's earning capacity and its failure to consider all of the defendant's sources of income requires that the court's judgment modifying the defendant's alimony obligation be reversed and the case remanded for a new hearing on the defendant's motion for modification.

B

The plaintiff next claims that the court's articulated finding that the defendant's net weekly earning capacity is $2700 is clearly erroneous and unsupported by the evidence. We agree. Because the court based its net earnings finding on its clearly erroneous finding that the defendant has a gross earning capacity of $200,000, the court's net earning capacity finding is also clearly erroneous.

C

The plaintiff also claims that the court's "findings that the plaintiff has a gross annual earning capacity of $20,800 and a net weekly earning capacity of approximately $350 per week were not supported by the evidence." (Internal quotation marks omitted.) She argues that "[t]here was no evidence that anyone would hire the plaintiff to work for forty hours each week, that anyone would pay her $10 per hour, or that she should work fifty-two weeks per year as a babysitter for a stranger while the defendant enjoys his 'golden years.' " The plaintiff further argues that the court had no evidence to compute a net earning capacity for her. Given our conclusion that the court's finding regarding the defendant's earning capacity requires us to reverse the judgment of the trial court and to remand the case for a new hearing on the defendant's motion, we need not address the plaintiff's argument and decline to do so.

D

The plaintiff claims that the court's "finding that [she] would receive $120,000 upon sale of the dental practice in 2016 was unsupported and speculative." The plaintiff argues that the "court considered all of the . . . § 46b-82 criteria, and those criteria include 'estate' and 'amount and sources of income.' . . . The trial court [therefore erred] by finding that the plaintiff would receive $120,000 from the defendant in 2016, and by considering that amount when it entered a modified alimony order." (Citation omitted.) Although the defendant concedes that the court's finding that a sale *was expected in 2016* was clearly erroneous, he argues that the finding was not relevant to the court's decision, and, therefore, it was harmless error.

We have reviewed the record in this case and agree with the plaintiff that there is no evidence to support the court's finding that "it is expected that a sale [of

the defendant's dental practice] will occur this year" and that the plaintiff will get $120,000 from that sale.[9] We agree, therefore, that this finding is clearly erroneous. Because we are reversing the judgment of the trial court and remanding the case for a new hearing on the defendant's motion for modification, and this error is not likely to recur on remand, it is not necessary for us to determine if the court's error was harmful.

III

The plaintiff next claims that "[t]he trial court misapplied *Borkowski* and *Dan* when it considered the . . . § 46b-82 criteria." See *Borkowski* v. *Borkowski*, 228 Conn. 729, 638 A.2d 1060 (1994), and *Dan* v. *Dan*, 315 Conn. 1, 105 A.3d 118 (2014). She argues that *Dan* requires the court to compare "conditions at the time of its modified order to conditions at the time of the last court order . . . ." Furthermore, she argues, although paragraph 4.3 of the agreement "allowed for a 'second look' at alimony without a substantial change in circumstances . . . [p]aragraph 4.1 . . . provided for $100,000 per year in alimony for an indefinite duration of time . . . [and] [t]here was no indication in the agreement that the plaintiff had an earning capacity, must obtain paid employment, or must become self-sufficient by a certain date. . . . There was no demonstration that circumstances had changed since the last court order such that it would be unjust or inequitable for the plaintiff to maintain her lifestyle after she attained age sixty-six. . . . The trial court abused its discretion by basing its alimony order on a reduced standard of living and an imputed earning capacity." (Citations omitted.)

The defendant argues that, by agreement of the parties, the defendant did not need to establish a substantial change in circumstances when obtaining review of his alimony order upon reaching the age of sixty-five. Accordingly, he argues, the court properly considered the statutory criteria used to determine the initial award and "properly considered the needs of the plaintiff and the earning capacities of both parties when entering the modified alimony award, and, these being the criteria that had changed since the date of dissolution of the parties' marriage, the trial court properly conformed its [new alimony order] to those changed criteria." We conclude that the court properly conducted a "second look" de novo review of alimony in accordance with the parties' agreement.

In *Hardisty* v. *Hardisty*, 183 Conn. 253, 258–59, 439 A.2d 307 (1981), our Supreme Court articulated a two part test to be conducted when addressing a motion to modify alimony. First, the court must find a substantial change in the financial circumstances of one of the parties. Id. Second, the court must determine whether modification is warranted. Id., 259.

In *Borkowski* v. *Borkowski*, supra, 228 Conn. 737, our Supreme Court further articulated that the bifurcated inquiry of the trial court is not two completely separate inquiries but that modification can be entertained on a showing of a "substantial change in the circumstances of either party to the original dissolution decree. . . . Thus, once the trial court finds a substantial change in circumstances, it can properly consider a motion for modification of alimony." (Citation omitted.) See also *Dan* v. *Dan*, supra, 315 Conn. 9.

"When a modification of alimony is requested on the basis of the [parties'] separation agreement, [however] the court must look to the agreement. Separation agreements incorporated by reference into dissolution judgments are to be interpreted consistently with accepted principles governing contracts." (Internal quotation marks omitted.) *Cushman* v. *Cushman*, 93 Conn. App. 186, 191, 888 A.2d 156 (2006). "The construction of a contract to ascertain the intent of the parties presents a question of law when the contract or agreement is unambiguous within the four corners of the instrument. . . . The scope of review in such cases is plenary." (Internal quotation marks omitted.) Id.

In the present case, the parties agreed that once the defendant reached his sixty-fifth birthday, that circumstance in and of itself would permit him to obtain a "second look" at the alimony order "without the need of showing a substantial change in circumstances." Although the plaintiff appears to argue that the court could not conduct a de novo review of alimony, and that it needed to find a substantial change of circumstances; see *Borkowski* v. *Borkowski*, supra, 228 Conn. 737; we conclude that the plain language of the agreement permitted the court to take a fresh look at the parties' financial circumstances after the defendant reached his sixty-fifth birthday. As we explained in *Taylor* v. *Taylor*, 117 Conn. App. 229, 233, 978 A.2d 538, cert. denied, 294 Conn. 915, 983 A.2d 852 (2009): "If that was not the intent of the parties, the second look language would have been superfluous because the agreement provided that alimony could be modified at any time if a substantial change of circumstances occurred. The [parties'] agreement, however, specifically provides that on the happening of . . . [the defendant's sixty-fifth birthday], alimony may be given a second look. We conclude, therefore, that this language permits a de novo review of the plaintiff's alimony obligation." See also A. Rutkin et al., 8 Connecticut Practice Series: Family Law and Practice with Forms (3d Ed. 2010) § 33:31, pp. 89–90 ("[w]hen the judgment . . . calls for a second look at a specified time or upon the occurrence of a specified event, there is no need for separate proof of a substantial change in circumstances and there is a de novo review at the time of the second look").

When conducting a de novo "second look," the court considers "the parties' financial circumstances de novo, as if it were an initial determination of alimony, requiring the application of § 46b–82 criteria." *Cushman* v. *Cushman*, supra, 93 Conn. App. 191. "Section 46b–82 set[s] forth the criteria that a trial court must consider when resolving property and alimony disputes in a dissolution of marriage action. The court must consider all of these criteria. . . . It need not, however, make explicit reference to the statutory criteria that it considered in making its decision or make express finding[s] as to each statutory factor. A ritualistic rendition of each and every statutory element would serve no useful purpose. . . . [T]he trial court is free to weigh the relevant statutory criteria without having to detail what importance it has assigned to the various statutory factors." (Internal quotation marks omitted.) Id.

In the present case, the trial court's memorandum of decision reveals that, in conducting the "second look" at alimony, the court took note of the award of alimony to the plaintiff at the time of the judgment of dissolution, as well as the fact that she was "awarded substantial assets through the separation agreement." The court specifically stated that it had "considered the statutory criteria pursuant to . . . [§] 46b-82 including the length of the marriage, the causes for the dissolution of the marriage, the age, health, station, occupation, amount and sources of income, earning capacity, vocational skills, education, employability, estate and needs of each of the parties," and its decision reflects that consideration. Indeed, the court's focus, as evinced by its memorandum of decision, was on the parties' present circumstances, including their current ages, employability, earning capacities, amount and sources of income, and their respective needs. We conclude, therefore, that although it made erroneous findings of fact that require reversal and a new hearing, the court properly conducted a "second look" at alimony under the agreement and that it properly considered the criteria of § 46b-82 in accordance with relevant case law.

IV

The plaintiff's final claim is that the court abused its discretion by lowering the defendant's insurance obligations without finding a substantial change in circumstances. The plaintiff also argues, however, that insurance orders, like property divisions, are nonmodifiable, and the court had no authority to rewrite the parties' agreement. The defendant argues that the plaintiff is attempting to "confuse the issues" because the parties' agreement provides that "the defendant's obligations to maintain disability insurance and life insurance were fully modifiable once the four year period of nonmodifiable alimony had passed." We agree with the defendant.

As explained previously in this opinion: "In a marriage dissolution action, an agreement of the parties executed at the time of the dissolution and incorporated into the judgment is a contract of the parties. . . . The construction of a contract to ascertain the intent of the parties presents a question of law when the contract or agreement is unambiguous within the four corners of the instrument. . . . The scope of review in such cases is plenary . . . [rather than] the clearly erroneous standard used to review questions of fact found by a trial court." (Citation omitted; internal quotation marks omitted.) *Williams* v. *Williams*, supra, 276 Conn. 497. Because the language of the agreement in the present case, as incorporated into the dissolution judgment, is clear and unambiguous, our review is plenary.

Paragraph 5.1 of the agreement provides in relevant part that the defendant "shall maintain insurance upon his life . . . in an amount not less [than] SEVEN HUNDRED FIFTY THOUSAND DOLLARS ($750,000) and shall name the [plaintiff] as beneficiary of said policy *in order to secure the [plaintiff's] alimony*. The amount of life insurance coverage . . . may . . . be reduced by ONE HUNDRED THOUSAND DOLLARS ($100,000) per year commencing on the fifth (5th) anniversary of the final decree for dissolution of marriage. Provided, however, no less than FOUR HUNDRED FIFTY THOUSAND DOLLARS ($450,000) *shall be maintained for the benefit of the [plaintiff] until the termination of alimony or pursuant to further Court order*." (Emphasis added.)

Paragraph 5.6 of the agreement provides in relevant part: "The [defendant] shall maintain his present disability insurance policies at no cost to the [plaintiff], pursuant to the provisions of Article IV[10] . . . . The [defendant] shall, at all times, keep said disability insurance in full force and effect . . . *until, when, and if the [defendant's] alimony obligation is terminated* pursuant to the provisions of Article IV . . . . Provided, however, commencing on the fourth (4th) anniversary of the final decree for dissolution of marriage, the [defendant's] *obligation to maintain his current level of disability insurance shall be modifiable in the same manner as alimony under Connecticut law*." (Emphasis added; footnote added.)

In its memorandum of decision, the court ordered that the defendant could reduce both his life insurance and his disability insurance by 50 percent. The plaintiff argues that the court abused its discretion because insurance orders are not modifiable and because the defendant did not prove a substantial change in circumstances. We disagree.

As to the plaintiff's argument that insurance is not modifiable, on the basis of the clear language of the agreement, we reject this contention outright. See also

General Statutes § 46b-86 (expressly authorizing modification of life insurance orders in marital dissolution decrees). Clearly, both insurance provisions in the agreement specifically provide that the amount of insurance is modifiable. Indeed, both provisions also anticipate the prospect that insurance could be terminated upon the termination of alimony. Accordingly, we need not address this argument further.

The plaintiff also argues that the court abused its discretion by modifying the amount of insurance the defendant was required to maintain without finding a substantial change in circumstances. She argues that despite the fact that paragraph 4.3 of the agreement provided that the defendant did not need to show a substantial change in circumstances upon reaching the age of sixty-five for a modification of alimony, the same was not provided in the paragraphs dealing with his insurance obligations. She argues, therefore, that the court needed to find a substantial change in circumstances. We are not persuaded.

As our law clearly provides: "[A] contract must be viewed in its entirety, with each provision read in light of the other provisions . . . and every provision must be given effect if it is possible to do so." (Internal quotation marks omitted.) *Nation-Bailey* v. *Bailey*, 316 Conn. 182, 192, 112 A.3d 144 (2015). Both insurance provisions in the agreement provide that they are meant to secure the plaintiff's entitlement to alimony. They also provide that they are modifiable by the court and terminable upon the termination of alimony. Thus, on remand, the court may consider whether the defendant's insurance obligations should be modified in connection with its resolution of the defendant's motion for modification of his alimony obligation. To hold otherwise would require that we overlook and disregard the stated purpose of the life and disability insurance provisions of the agreement.

The judgment is reversed and the case is remanded for a new hearing on the defendant's motion for modification.

In this opinion the other judges concurred.

[1] Specifically, article 4.3 of the agreement provides: "It is acknowledged that the husband has the right to retire upon reaching the age sixty-five (65) years and he may petition the Court to take a 'second look' for a hearing to determine the amount of alimony which he shall pay to the wife. The retirement of the husband at age sixty-five (65) shall be considered a substantial change in circumstances, but in any event, even if the husband does not retire at age sixty-five (65), he shall have a right to seek a modification of alimony at age sixty-five (65) without the need of showing a substantial change in circumstances. This provision is not intended to limit the modifiability of alimony before or after that date, pursuant to Connecticut statutory and case law, except as provide under Article 4.1 above."

[2] In another part of its decision, the court found that the plaintiff's earning capacity was $20,000. In its articulation, however, it restated her gross earning capacity as $20,800.

[3] At the time of the dissolution in 2008, the plaintiff's financial affidavit provided that her living expenses were $187,497.96 per year.

[4] Although the defendant had requested that the modification be made

retroactive to the date of the filing of the motion, the court denied that request, explaining that the defendant had enjoyed his higher income during that period and that the plaintiff presumably had spent that money.

[5] The court explained that "[t]he life insurance and disability insurance obligation agreed to by the parties at the time of the dissolution can and should be reduced at this time as the term to be protected is shorter and the amount is lower than at the time of the divorce."

[6] In an articulation, the court explained that the plaintiff's net earning capacity is approximately $350 per week, and the defendant's net earning capacity is approximately $2700 per week.

[7] Our conclusion that the court reasonably could conclude, based on the evidence presented, including the agreement that anticipated a reduction in the defendant's work schedule, that the defendant had an earning capacity less than his current income does not change what must be shown to determine the defendant's specific earning capacity. The court's conclusion as to earning capacity must be based on evidence of what reasonably can be expected. The court cannot rely on speculation as to a defendant's hopes or desires as to a reduced work schedule. In order to conclude that the defendant's earning capacity is less than his actual income, the court must have evidence that the defendant actually has taken steps or has demonstrated that he will be taking steps to reduce his income, and there must be evidence as to the effect such steps will have on the defendant's earning capacity.

[8] We are mindful that our Supreme Court in *Tuckman* v. *Tuckman*, 308 Conn. 194, 209–10, 61 A.3d 449 (2013), a case involving a child support obligation, explained that although a tax return may demonstrate that "a substantial portion of [a party's] taxable income . . . was income from [that party's] share of the S corporation . . . [because an S corporation's] capital gains and losses, for federal income tax purposes, pass through [it] to the individual shareholders . . . any federal income tax liability on capital gains is the responsibility of the individual shareholder. . . . All of the earnings of such a company must be reported as individual income by its [shareholders]." (Citation omitted; internal quotation marks omitted.) That does not signify, however, what portion of the money "was actually available to the [party] and what portion was merely [pass] through earnings of the S corporation." (Internal quotation marks omitted.) Id., 210. Here, the court and the defendant attributed the entire S corporation income to him for a total gross income of $469,459.

[9] Schedule A of the agreement provides in relevant part that the plaintiff will receive 20 percent of the net consideration received for the sale of the practice.

[10] Article IV of the agreement provides in relevant part that disability insurance was to be maintained to "secure the alimony payment" to the plaintiff.

---